**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:24-cv-02851-RMR

V.B., a minor, by and through her next friend, Ronnie Broyles,

      Plaintiff(s),

v.

Academy School District 20,
Belinda Lujan Lindsey, in her individual capacity,
Marca de Jong, in her individual capacity,
Julie Brzozowski, in her individual capacity,
Stephen Scott, in his individual capacity,
Kimberly Hellstrom, in her individual capacity,
Mandy Leap, in her individual capacity,
Emily Fulton, in her individual capacity
Jenny Divitto, in her individual capacity,
Mysha Hillman, in her individual capacity,
Diane Besmer, in her individual capacity

      Defendant(s).

---

**FIRST AMENDED COMPLAINT WITH JURY DEMAND**

---

Plaintiff, V.B., a minor, by and through her next friend and father Ronnie Broyles ("Father" or "Mr. Broyles") hereby respectfully files this action against Academy School District 20 ("District" or "Defendant 20"); Belinda Lujan Lindsey ("Defendant Lindsey"), in her individual capacity; Stephen Scott ("Defendant Scott"), in his individual capacity; Marca de Jong ("Defendant de Jong"), in her individual capacity; Julie Brzozowski ("Defendnat Brzozowski"), in her individual capacity; Kimberly Hellstrom ("Defendant Hellstrom"), in her individual capacity; Mandy Leap ("Defendant Leap"), in her individual capacity; Emily Fulton ("Defendant

Fulton"), in her individual capacity; Jenny Divitto ("Defendant Divitto"), in her individual capacity; Mysha Hillman ("Defendant Hillman"), in her individual capacity; and Diane Besmer ("Defendant Besmer"), in her individual capacity (collectively "Defendants"), by and through counsel Kishinevsky & Raykin, Attorneys at Law, and states on information and belief as follows. This action seeks injunctive and equitable relief, and appropriate damages and costs.

## I.    JURISDICTION AND VENUE

1.    The Court has jurisdiction over this claim pursuant to 28 U.S.C. §§ 1331, 1341, and 1367, and 20 U.S.C. § 1415(i)(3)(A).

2.    Plaintiff is a resident of El Paso County, Colorado.

3.    Defendant Academy School District 20 has its principal place of business in El Paso County, Colorado.

4.    Venue is proper pursuant to 28 U.S.C. § 1391(b) as the wrongful acts alleged by the Plaintiff occurred in whole or in part in Colorado.

## II.    PARTIES

5.    Plaintiff is a minor student currently enrolled in the Defendant school district.

6.    Plaintiff is a disabled child within the meaning of Section 504 of the United States Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131 *et seq.*; and the Colorado Anti Discrimination Act ("CADA"), C.R.S. § 24-24-801 *et seq.* Plaintiff's intellectual and physical disabilities impair major life activities including, but not limited to, communicating, breathing, eating, walking, concentrating, and socializing.

7.      Plaintiff is also a disabled child within the ambit of the Individuals with

Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* Plaintiff has qualified for special

education services based on her disabilities since at least 2018.

8.      Defendant A20 is a recipient of federal financial assistance subject to the

requirements of Section 504, 34 C.F.R. § 104.11, and a public governmental entity subject to the

provisions of the ADA, 42 U.S.C. §§ 12132, 12131, (1)(A), (B).

9.      Defendant A20 is a local educational agency ("LEA"), subject to the IDEA.

10.     Each individual Defendant (Lindsey, Scott, de Jong, Brzozowski, Hellstrom,

Leap, Fulton, Divitto, Hillman, and Besmer) is an employee of Defendant A20.

11.     All events involving Plaintiff and Defendants as relevant to this case occurred

within El Paso County, Colorado.

## FACTUAL ALLEGATIONS

### Background

12.     The Plaintiff, V.B., is a profoundly disabled little girl.

13.     V.B. suffers from more than two dozen disabilities.[1] As relevant here, her most

significant disabilities are autism, paraplegia, and a tracheostomy.[2]

---

[1] V.B.'s disabilities include, but are not limited to, spina bifida, Arnold Chiari Malformation Type 2, hydrocephalus with a ventriculoperitoneal ("VP") shunt, syringomyelia, neurogenic bladder, paraplegia, gastric dumping syndrome, hyperinsulinemia/hypoglycemia, dysautonomia, tracheomalacia, bilateral vocal cord paralysis, central apnea, congenital central hypoventilation syndrome, hypoxemia, tracheomalacia/laryngomalacia, Dandy Walker cyst, hip dysplasia, anisocoria, chronic ethmoidal sinusitis, scoliosis, strabismus, autism, and methicillin-resistant staphylococcus aureus ("MRSA").

[2] A tracheostomy is "a procedure to help air and oxygen reach the lungs by creating an opening into the trachea (windpipe) from outside the neck. A person with a tracheostomy breathes through a tracheostomy tube inserted in the opening." Nasir Bhatti, M.B.B.S, M.D., Johns Hopkins Medicine, available at https://www.hopkinsmedicine.org/health/treatment-tests-andtherapies/tracheostomy#:~:text=Tracheostomy%20is%20a%20procedure%20to,tube%20inserted%20in%20the%20opening.

14. V.B.'s disabilities effect every aspect of her life. V.B.'s impaired major life activities include, eating, breathing, walking, and communicating; however, essentially *all* major life activities are impaired due to the extent of her disabilities and their related complications.

15. To breathe, V.B. requires supplemental oxygen and a ventilator. While she can "sprint" for short periods of time without the ventilator, her oxygen levels must be constantly monitored to ensure she does not suffer oxygen deprivation. At night, V.B. must remain on the ventilator constantly so she does not suffocate in her sleep.

16. As a paraplegic, V.B. cannot effectively ambulate. To move, she must rely on a wheelchair, mobility trike, and the support of her medical team and parents.

17. Because of her multiple lung and throat related disabilities, as well as her autism, V.B. is nonverbal. Instead of speaking, she communicates through a combination of sign language and an augmentative and alternative communication ("AAC") device.

18. The symptoms described above are just some of the ways V.B.'s life is impaired due to her disabilities. Her disabilities cause her to live a fundamentally different life than nondisabled persons.

**Infection Risk**

19. As relevant here, V.B.'s most significant disability-related complication is a high risk of severe infection.

20. Specifically, V.B. is at high risk of contracting infections because of the complications associated with her disabilities, primarily due to her tracheostomy.

21. However, V.B. is not just at higher risk of *contracting* an infection, but also of suffering severe and life-threatening consequences should she become infected.

22. Together, V.B.'s higher chance of infection and her higher risk of dangerous consequences compose her total "infection risk."

23. V.B.'s high risk of contracting an infection is primarily due to her tracheostomy.

24. As noted above, *supra* n. 2, at 2, V.B.'s tracheostomy creates an opening to her lungs. This opening lacks a mucus membrane and other infection-preventing barriers found in the nose and mouth.

25. Thus, it is far easier for V.B. to contract an infection, and for the infection itself to be much more severe because it can immediately develop within her lungs rather than gradually spreading from nose or mouth to the lungs.

26. Because the infections incubate in the lungs, even mild contagions are much more severe for V.B. than for non-disabled people.

27. For example, bronchitis is an inflammation of the airway often caused by viral infection.[3] For a non-disabled person bronchitis usually develops gradually and is treated with over the-counter medication. While bronchitis can develop into pneumonia, it is uncommon. For V.B. however, pathogens have unfiltered access to her airway. This causes her illnesses to worsen much more quickly than they do in the public, including by developing into pneumonia.

28. V.B.'s other disabilities also cause her to suffer much more severe symptoms. For example, due to the combination of her disabilities, she does not tolerate stress and fatigue. When she becomes fatigued, it can cause her blood-oxygen to desaturate. Symptoms like this mean that when V.B.'s body is stressed by even a moderate infection, it can easily and swiftly develop into a life-threatening condition.

---

[3] "Bronchitis," Cleveland Clinic, available at https://my.clevelandclinic.org/health/diseases/3993-bronchitis

29.     Because V.B. is nonverbal and cognitively impaired, her ability to communicate when she is ill is also severely impaired. Accordingly, her parents and other caregivers must closely monitor her for signs of illness, stress, and fatigue, and rapidly respond to any such signs to prevent life-threatening consequences.

30.     V.B. is currently ten years old; however, she has already suffered more than ten respiratory infections that required hospitalization and emergency treatment, a rate of more than one hospitalization per year.

31.     Because of these infections, and other similar risks to V.B.'s health and safety, her parents (the "Broyleses") work extremely hard to keep her safe from common infection vectors.

32.     As part of this work, the Broyleses heavily coordinate with V.B.'s multidisciplinary medical team to keep her safe and healthy.

33.     V.B. initially lived in the hospital in an intensive care unit. Since leaving the hospital in 2018, her doctors' have uniformly recommended home-based education rather than attending a traditional elementary school.

34.     Children, especially young children, are known spreaders of disease. Airborne pathogens specifically, are incredibly difficult to deter in an elementary school environment.

35.     As V.B. is particularly vulnerable to airborne disease, educating her in an isolated environment is essential to keeping her healthy.

### Qualification for Special Education

36.     V.B. qualifies for special education under the IDEA. *Accord* 20 U.S.C. § 1400 *et seq.*

37.     The IDEA requires LEAs to develop Individualized Education Programs ("IEPs") for disabled children. 34 C.F.R. §§ 300.320-323.

38.     IEPs must include an educational placement, which must comply with the "Least Restrictive Environment" ("LRE") provisions of the IDEA. 34 C.F.R. § 300.114.

39.     The LRE requires disabled children to be educated with non-disabled children "[t]o the maximum extent appropriate." *Ibid.* This provision creates a hierarchy of placements, from general education as the least restrictive, to hospitalization as the most restrictive.

40.     The IDEA presumes that disabled children will be educated in the LRE unless "the nature or severity of the disability is such that education in regular classes . . . cannot be achieved satisfactorily." *Ibid.*

41.     Because of the extent of V.B.'s disabilities and life-threatening infection risk, all V.B.'s IEPs from 2018-2022 placed her in the home.

42.     To facilitate this kind of education, tutors and therapists come to V.B.'s home for a few hours per day to deliver the services she is entitled to pursuant to her IEP.

43.     However, in 2023, the Defendant, Academy School District 20 ("Defendant A20" or "District") capriciously ordered V.B. to attend school in person.

### Disability Law and the Defendant

44.     Defendant A20 is the Local Educational Agency ("LEA," i.e., school district) for the area of northwestern Colorado Springs, CO.

45.     As a public school district, the District is required to comply with the IDEA.

46.     As a public entity that receives federal funds, the District is also obligated to comply with the ADA, Section 504, and, Colorado's equivalent, the CADA.

47.     Pursuant to the IDEA, the District is required to provide all disabled children within its boundaries a free and appropriate public education. 34 C.F.R. § 300.101.

48.     The District is also required to ensure the availability of a "continuum of alternative placements" including "home instruction." 34 C.F.R. 300.115.

49.     Homebound instruction is also a reasonable accommodation as required by the ADA. *Compare id.*, *with* 28 C.F.R § 35.130(b)(7) (requiring public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability").

50.     That the IDEA requires school districts like the District to *ensure* the availability of homebound instruction means that homebound instruction cannot constitute a "fundamental[] alter[ation] [of] the nature of the [District's] service, program, or activity." *Ibid.*

51.     Despite its ADA and IDEA legal obligations, for at least the past fifteen years, the District has denied children including V.B. homebound educational services.

### The Due Process Dispute

52.     V.B. and her family moved into the District in May 2023.

53.     Previously, from February through May 2023, V.B. lived and was enrolled in Colorado Springs District 11 (D11). Prior to February 2022, the Broyleses lived in California

54.     In both California and D11, V.B. received homebound educational services.

55.     Specifically, D11 developed an Interim Service Plan ("ISP") to provide V.B. special education services while it developed an IEP.

56.     The D11 ISP obligated D11 to provide 180 minutes of homebound instruction, three times per week, in addition to other homebound services for communication and therapy.

57.     Before D11 developed a final IEP, the Broyleses bought a house in the Defendant's school district.

58.     As a result, for the 2023-2024 academic year and beyond, the District was V.B.'s LEA. As V.B.'s LEA, the District was obligated to develop an IEP for V.B. that comprehensively addressed, served, and accommodated her individual disability needs.

59.     However, since May 2023, the District has consistently denied V.B. a homebound placement.

60.     The District refusal to provide V.B. with homebound services violated the IDEA. *See, e.g.*, 34 C.F.R. § 300.115 (requiring the availability of homebound placements); *see also* 34 C.F.R. § 300.304(c)(4) (requiring a "comprehensive" special education evaluation); 34 C.F.R. § 300.320(a)(1)(i) (requiring IEPs based on the child's individual needs)

61.     The District's refusal also constitutes a denial of reasonable accommodations under the ADA. 42 U.S.C. § 12132.

62.     As a disabled child, V.B. is entitled to the District's educational services with or without reasonable accommodations.

63.     As discussed above, V.B. cannot receive an education within a traditional school environment. Homebound education is a reasonable accommodation given her disability needs and the District prior obligation to make homebound services available to disabled children.

64.     From May to September 2023, the Broyleses requested homebound services multiple times throughout the District's IEP process. Additionally, the Broyleses completed a formal application for homebound services on September 12, 2023.

65.     Each of the Broyleses requests triggered the District's duty to provide V.B. with reasonable accommodations.

66.     As discussed above, the Broyleses request for homebound educational services was per se reasonable because homebound education is an IDEA requirement, 34 C.F.R. §

300.115, and complying with the federal law is per se reasonable. *See T.B. v. San Diego Unified Sch. Dist.*, No. 12-56060, 2015 U.S. App. LEXIS 13365, at *38 (9th Cir. July 31, 2015) (holding "where the State has defined an accommodation by law, that accommodation is enforceable in court").

67.    The District is already obligated by federal law to provide homebound services. Providing V.B. homebound services cannot constitute a fundamental change to the District's programs, where it is already obligated to do so by federal law.

68.    To support their request for homebound services, the Broyleses provided the District unfettered access to V.B.'s medical history. This included both V.B.'s California and Colorado medical records.

69.    These records reveal that V.B. suffers from a multitude of severe disabilities including more than ten independent hospitalizations due to respiratory infections.

70.    Despite being provided total access to these records, the District, and Defendants Lindsey, Scott, de Jong, Brzozowski, Hellstrom, Leap, Fulton, Divitto, Hillman, and Besmer, failed to comprehensively evaluate V.B. and only identified V.B.'s prior surgical history as relevant to her IEP placement.

71.    Aside from her medical records, the Broyleses also submitted the recommendations of two of V.B.'s doctors, Dr. Sara Anderson, pediatrician, and Dr. Christina Papantonakis, pulmonologist.

72.    Dr. Anderson submitted the following recommendation:

August 4, 2023

Patient:        V███ B███ ████████ (DOB: 7/28/2013))

To Whom it May Concern,

I am the Pediatrician taking care of V███ B███. She has complex conditions to include being dependent on a tracheostomy and ventilator for her breathing, a neurogenic bladder and physical disabilities restricting her ability to sit or ambulate independently. These medical conditions make in person schooling risky and logistically difficult.

Of most concern is her dependence on a tracheostomy and ventilator. This puts her at high risk for infections and higher consequences than other children if she contracts respiratory illnesses. It would be safest for her to avoid public places as much as possible especially during viral season (late fall through early spring.) Ideally she can continue to have schooling at home to avoid the increase in exposure to viruses that in person schooling brings.

In addition due to her neurologic status she needs a temporary (in and out) urinary catheter throughout the day. This needs to be done by a parent or qualified medical provider.

Lastly she is unable to sit or ambulate independently. For this she needs a sophisticated wheel chair and physical/occupational therapies 2-4 times a week to maintain her muscular and skeletal health.

Victoria's health and daily cares are much safer and easier to maintain in her home environment. \

If you have questions, please do not hesitate to contact the clinic.

73.    Papantonakis similarly recommended the following:

> To whom it may concern,
>
> V____ is tracheostomy and ventilator dependent and is at high risk for poor outcomes should she get a viral illness. Parents request avoiding this risk by initiation of home schooling. A request with which I agree.
>
> Please call with any questions.
>
> Sincerely,
>
> *[signature]* MD
>
> Christina Papantonakis, MD
> Assistant Professor of Pediatrics
> University of Colorado School of Medicine
> Section of Pulmonary Medicine
> Breathing Institute, Children's Hospital Colorado

74.    Throughout the IEP process, the District also contacted Dr. Laura Wo, one of V.B.'s previous doctors in California. Dr. Wo provided a similar recommendation as follows:

> Wo, Laura Lazzarini, M.D. → P Cos Pulm Nurse
> Caller: Unspecified (2 days ago, 8:16 AM)
> Hello,
>
> After reviewing Victoria's chart, I do not suspect she has an underlying immunodeficiency. We do not have immunodeficiency labs in our system (including no CBC). She has labs from 9 years ago in Care Everywhere that show normal white blood cell count. Parents may have more lab records from the previous hospital where Victoria received care. That being said, she is at increased risk of severe respiratory compromise if she were to get sick with viral illness or develop bacterial pneumonia and avoiding infections as much as possible is very important to her health.
>
> Please let me know if you have any other questions or concerns or there's anything else I can do to help.
>
> Thank you,
> Dr. Wo

75.    Each doctor explained V.B.'s infection risk and complications.

76.    Drs. Anderson and Papantonakis also specifically recommended that V.B. receive homebound instruction.

77.     The District and each of the named Defendants <u>ignored</u> these recommendations and substituted its own conclusion, without *any medical evidence*, that V.B. could safely attend school.

78.     Following its unjustifiable conclusion, the District presented the Broyleses with an ultimatum: risk V.B.'s life by bringing her to school in person or deny V.B. an education.

79.     When the Broyleses decided that V.B.'s health and safety outweighed their desire to continue her education, the District threatened the Broyleses with truancy proceedings.

80.     The District's refusal to provide homebound services not only violated V.B.'s rights to a comprehensive and individualized IEP, but also its own contractual obligation to provide V.B. homebound services equivalent to the services she received in D11, as excerpted below:

☑ The IEP dated _3-3-23_____ from _District 11_____ district is not adopted.
An IEP meeting is scheduled for _9-19-23_____.

**The following special education and related services will be provided on an interim basis** 300.323(e)(2): Please refer to the ISP dated 3-3-23 from D11, services will be provided until a new IEP can be developed and FAPE offer made, not to exceed a total of 90 days from consent for eval.

**Comparable Service Delivery Statement**
Statement of types and anticipated setting of services to be provided to and on behalf of the student:
300.320(a)(7)  Homebound tutoring 180 min three times per week for academic goals, 180 min per month for communication, 60 min a month for OT and PT.

81.     Following the District's arbitrary refusal to provide V.B. with any kind of safe educational placement, in January 2024, the Broyleses challenged the District's IEP through the IDEA's due process dispute procedures. 34 C.F.R. § 300.508.

82.     The dispute went to trial on June 3, 2024, before the administrative court.

83.     During trial, each of the individual Defendants agreed that the District does not, and had not provided permanent homebound services to any student during their period of employment.

84.    For employees such as Defendant de Jong and Lindsey, this included at least 15-years of failure to provide homebound services.

85.    On July 22, 2024, the administrative law judge ("ALJ") ruled in favor of V.B. on all counts:

**Ongoing Violations**

> **ORDER**
>
> The ALJ concludes that the Complainants met their burden of proof to establish that the District violated the IDEA and failed to provide the V.B with FAPE by 1) failing to justify its dramatic departure from prior placements; 2) the creation of goals wholly inconsiderate of her individual circumstances; 3) denied a homebound placement on the basis of district policy which too narrowly interprets regulations and is inconsistent with case law; and 4) obdurately predetermined her placement in general education 40-79% of the time.
>
> Therefore, Complainants are entitled to equitable relief in the form of compensatory special education services, prospective education services in a homebound placement, and reimbursement of out of pocket expenses Complainants have incurred due to the District's IDEA violations. This Decision is the final decision of the independent hearing officer, pursuant to 34 C.F.R. §§ 300.514(a) and 300.515(a). In accord with 34 C.F.R. § 300.516, either party may challenge this decision in an appropriate court of law, either federal or state.
>
> **DONE AND SIGNED** this 22nd day of July 2024.
>
> /s/ LILITH Z. COLE
> Lilith Z. Cole
> Administrative Law Judge

86.    Significantly, the ALJ found that the District "denied [V.B.] a homebound placement on the basis of district policy."

87.    Since July 2024, the District has continued to deny V.B. access to her education and necessary services, in violation of the ALJ's order. Furthermore, the District has retaliated against V.B. and her family for seeking the services that the ALJ ordered.

88.    August 13, 2024, was the first day of school in the District. Despite the ALJ's order, V.B. did not receive any homebound services.

89. Between August 13 and 20, the parties continued to correspond regarding V.B.'s services; however, on August 20, the District retaliated against V.B. through its alleged concerns with the Broyles's security cameras.

90. V.B.'s parents maintain security cameras in their home. Aside from general safety, they also do so to monitor V.B. and ensure her safety.

91. Once the District finally agreed to provide services, it ordered Mr. Broyles to turn off his camera, before it would begin. Thus, the District conditioned V.B.'s relief and right to access her education on turning off home security cameras and a continuous monitor of V.B.'s health.

92. When Mr. Broyles refused to turn off his cameras, the District's asserted that its service providers must also be allowed to film in his home. Again, the District made this demand before providing any services, thereby conditioning V.B.'s services on whether her parents would concede to its demands.

93. Fearing that the District would withdraw services if he did not allow it to film, Mr. Broyles conceded. However, thereafter, he refused to let the District film in his home. In response, the District again refused to provide services, forcing the involvement of counsel.

94. In the interim, the District also failed to convene to update V.B.'s IEP.

95. The ALJ's July 22, 2024, Order specifically found the IEP out of compliance with the IDEA and case law; however, nearly a month later, the District had failed to convene a new IEP meeting and develop a new IEP that actually served V.B.

96. Throughout this time, the District consistently failed to provide V.B. special education services according to her actual needs and compensatory services according to the District's denials of FAPE.

97.     The District also repeatedly intervened in the process, inserting irrelevant and unlawful conditions on the provision of V.B.'s services.

98.     Accordingly, the District not only violated the ALJ's order, but it also sought to retaliate against the Broyleses for their victory for V.B.

99.     These disputes were not resolved until September 23, 2024, when the District finally conducted an IEP meeting and provided V.B. services without condition or prior restraint on the Broyleses.

100.    However, the new IEP is written to provide V.B. services *in-school*. While the District issued a prior written notice ("PWN") modifying the IEP to provide for a homebound placement, the District is continuing to make this process as difficult as possible and to claw back as much power over V.B. as it can achieve.

101.    Rhetorically, *why* should V.B.'s IEP be written as if she were in-school, if she has not, cannot, and will never attend school? Why would the District create an IEP that represents a legal fiction, in contradiction to the orders of the ALJ, then modify it with a separate document to conform to the ALJ's order?

102.    The District's actions are not only needlessly complicated, but intentionally misleading.

103.    The District is a sophisticated party. The Broyleses are not. Neither are the thousands of parents in the District's jurisdiction.

104.    The District's actions show that it is committed to overwhelming, silencing, and steamrolling parents wherever necessary to achieve its policy goals.

105.    Even now, after *losing* before the ALJ, this District is continuing to assert its authority to withhold homebound services from students with IEPs. Why else would the District create an in-school IEP for a homebound student, and then modify it with an external document?

106.    The administrative record below and the District's actions since July 2024 show that it is committed to abusing the IDEA process and obtaining whatever advantage against parents it can, whether real or imagined.

**Denial of FAPE and Reasonable Accommodations**

106.    As discussed above, V.B. is entitled to an education through both the ADA and IDEA. *See, e.g.*, 34 C.F.R. § 300.115 (requiring the provision of "home instruction" under the IDEA); 42 U.S.C. § 12131 (requiring the District to provide reasonable accommodations).

107.    As found by the ALJ, the District actions fundamentally violated V.B.'s IDEA rights. The District's IDEA violations also constitute ADA violations because the District outright denied her an education based on her disabilities.

108.    The District's IDEA and ADA violations are knowing and intentional.

109.    By arbitrarily denying V.B. homebound services, the District failed to reasonably accommodate her disability needs.

110.    The collective Defendants manifest actions show clear animus to highly disabled individuals who require homebound services. Specifically, these actions include the District's and Defendants Defendants Lindsey, Scott, de Jong, Brozozwski, Hellstrom, Leap, Fulton, Divitto, Hillman, and Besmer's, failures to review V.B.'s medical records, their willingness to override the opinions of three independent doctors without evidence, and to forcibly install V.B. in dozens of hours of school without any regard for her actual abilities or needs.

111.    By arbitrarily denying V.B. homebound services, the District failed to reasonably accommodate her disability needs.

112.    By failing to accommodate, the District deprived her of her equal opportunity to receive the benefits that other participants in the District's programs and services receive and enjoy.

113.    Depriving V.B. of access to participation and the benefits of the District's programs, the District discriminated against V.B. based on her disabilities, violating the foundation of the ADA.

114.    Denying V.B. homebound services also denied her FAPE, the fundamental purpose of the IDEA. 34 C.F.R. § 300.101.

### Deliberate Indifference

114.    The District and the individual Defendants' arbitrary and capricious conduct manifests deliberate indifference to V.B.'s federally protected rights and medical needs.

115.    Denying V.B. educational services despite full knowledge of her medical history, without *any* contradictory evidence, is an arbitrary decision.

116.    Continuing to deny those services after being ordered to provide them by the administrative court is arbitrary.

117.    Conditioning the conferral of those services upon accepting unreasonable and unlawful conditions is arbitrary and coercive.

118.    Drafting a new IEP that does not actually reflect V.B.'s homebound status is arbitrary and capricious.

119.    The Defendants' actions at the expense of a child's education is fundamentally antithetical to the IDEA, ADA, and disability law in general.

### III.    LEGAL CLAIMS

### COUNT I

### DEFENDANT VIOLATED SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794
### (*Against Defendant A20*)

120.    Plaintiff incorporates, by reference, all previous paragraphs of the Complaint herein.

121.    Pursuant to Section 504 of the Rehabilitation Act of 1973 ("Section 504") and its regulations "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794.

122.    The District is a recipient of federal financial assistance and operates public elementary and secondary education programs and activities. Therefore, it is a covered entity under 29 U.S.C. § 794.

123.    The Plaintiff is a person with a disability within the meaning of 29 U.S.C. § 794.

124.    The District intentionally discriminated against the Plaintiff by failing to provide her with reasonable accommodations.

125.    The District also intentionally discriminated against the Plaintiff by excluding her from participation in and denying her the benefits of the District's programs or activities solely because of her disability in violation of 29 U.S.C. § 794.

126.    The District has otherwise intentionally discriminated against the Plaintiff in violation of Section 504.

127.    As a direct and proximate cause of the District's violation of Section 504, the

Plaintiff has suffered and continues to suffer denial of education, denial of access, and retaliation.

**COUNT II**

**DEFENDANT VIOLATED TITLE II OF THE AMERICANS WITH DISABILITIES
ACT, 42 U.S.C. §§ 12131 *et seq.***
**(*Against Defendant A20*)**

128.    Plaintiff incorporates by reference all previous paragraphs of the Complaint

herein.

129.    Title II of the ADA and its regulations provide that "no qualified individual with a

disability shall, by reason of such disability, be excluded from participation in or be denied the

benefits of the services, programs, or actives of a public entity, or be subjected to discrimination

by any such entity." 42 U.S.C. § 12132 (*see also* 28 C.F.R. Part 35).

130.    Within the public entity context, to state an ADA claim, a plaintiff must establish

"(1) they are qualified individuals with a disability; (2) they were excluded from participation in

or denied the benefits of a public entity's services, programs, or activities, or were otherwise

discriminated against by the entity; and (3) such exclusion, denial of benefits, or other

discrimination, was by reason of their disabilities." *Douglas Cnty. Sch. Dist. Re-1 v. Douglas

Cnty. Health Dep't*, 568 F. Supp. 3d 1158, 1164 (D. Colo. 2021) (citing *J.V. v. Albuquerque Pub.

Sch.*, 813 F.3d 1289, 1295 (10th Cir. 2016)).

131.    Plaintiff is a person with a disability within the meaning of 42 U.S.C. § 12102.

132.    Plaintiff possesses multiple disabilities which impair major life activities such as

working, thinking, eating, breathing, communicating, and walking.

133.    The District is a public entity subject to Title II of the ADA, 42 U.S.C. § 12132.

134.    The District excluded the Plaintiff from participation in and denied her the benefits of its services.

135.    The District's exclusion and denial was solely due to Plaintiff's disability.

136.    The District's exclusion and denial was intentional.

**COUNT III**

**DEFENDANT VIOLATED THE COLORADO ANTI-DISCRIMINATION ACT,
C.R.S. § 24-34-801 *et seq.*
(*Against Defendant A20*)**

137.    Plaintiff incorporates by reference all previous paragraphs of the Complaint herein.

138.    The Colorado Anti-Discrimination Act ("CADA") affirms that it is the policy of the State of Colorado "[t]o encourage and enable…individuals with a disability to participate fully in social, employment, and educational opportunities… on the same terms and conditions as individuals without a disability" and "[t]hat…individuals with a disability must not be excluded, by reason of his or her disability, from participation in or be denied the benefits of the services, programs, or activities of any public entity or be subject to discrimination by any public entity." C.R.S. §24-34-801 (1)(a),(d). These rights are codified as a Civil Right in the Colorado Revised Statutes.

139.    The District is a public entity subject to C.R.S. §24-34-801 *et seq.* per C.R.S. §24-34-301(5.4)(b).

140.    The Plaintiff is an individual with a disability under C.R.S. §24-34-301(2.5).

141.    The District discriminated against Plaintiff in the full utilization of or benefit from the services provide and rendered by District due to the Plaintiff's disability.

142. The District intentionally discriminated against Plaintiff by denying and limiting her access to education.

143. When the Plaintiff attempted to vindicate her rights, the District retaliated by seeking truancy proceedings.

144. Upon losing in court, the District continued to retaliate by failing to comply with the ALJ's order, delaying providing V.B.'s services, and creating unnecessary and unlawful conditions before providing the services, among others.

145. The District otherwise violated Plaintiff's rights under the CADA.

## COUNT IV

### RETALIATION IN VIOLATION OF SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794
#### (*Against Defendant A20*)

146. Plaintiff incorporates, by reference, all previous paragraphs of the Complaint herein.

147. The District is a recipient of federal financial assistance and operates public elementary and secondary education programs and activities. Therefore, it is a covered entity under 29 U.S.C. § 794.

148. The Plaintiff is a person with a disability within the meaning of 29 U.S.C. § 794.

149. When challenged for its violations of the Plaintiff's rights, the District went to court and lost. Since then, the District has continued to harass and antagonize the Plaintiff, limit her access to relief, and maintain an IEP that facially conflicts with the ALJ's order.

150. Plaintiff's IDEA and Section 504 rights are comingled and retaliation against the Plaintiff's IDEA rights constitutes retaliation against her 504 rights.

151.    When the Plaintiff attempted to vindicate her rights, the District retaliated by seeking truancy proceedings.

152.    Upon losing in court, the District continued to retaliate by failing to comply with the ALJ's order, delaying providing V.B.'s services, and creating unnecessary and unlawful conditions before providing the services, among others

153.    As a direct and proximate cause of Defendants' retaliation in violation of Section 504, the Plaintiff has suffered and continues to suffer denial of education, and infringement upon her rights.

## COUNT V

### RETALIATION IN VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. §§ 12131 *et seq.*

154.    Plaintiff incorporates, by reference, all previous paragraphs of the Complaint herein.

155.    Plaintiff is a person with a disability within the meaning of 42 U.S.C. § 12102.

156.    Plaintiff possesses multiple disabilities which impair major life activities such as working, thinking, eating, breathing, communicating, and walking.

157.    The District is a public entity subject to Title II of the ADA, 42 U.S.C. § 12132.

158.    The District excluded the Plaintiff from participation in and denied her the benefits of its services.

159.    The District exclusion and denial was solely due to Plaintiff's disability.

160.    The District exclusion and denial was intentional.

161.    Plaintiff's IDEA and ADA rights are comingled and retaliation against the Plaintiff's IDEA rights constitutes retaliation against her ADA rights.

162.    When the Plaintiff attempted to vindicate her rights, the District retaliated by seeking truancy proceedings.

163.    Upon losing in court, the District continued to retaliate by failing to comply with the ALJ's order, delaying providing V.B.'s services, and creating unnecessary and unlawful conditions before providing the services, among others

164.    As a direct and proximate cause of Defendants' retaliation in violation of ADA, the Plaintiff has suffered and continues to suffer denial of education, and infringement upon her rights.

**COUNT VI**

**RETALIATION IN VIOLATION OF THE COLORADO ANTI-DISCRIMINATION ACT, C.R.S. § 24-34-801 *et seq.***
**(*Against Defendant A20*)**

165.    Plaintiff incorporates, by reference, all previous paragraphs of the Complaint herein.

166.    The District is a public entity subject to C.R.S. §24-34-801 *et seq.* per C.R.S. §24 34-301(5.4)(b).

167.    The Plaintiff is an individual with a disability under C.R.S. §24-34-301(2.5).

168.    The District discriminated against Plaintiff in the full utilization of or benefit from the services provide and rendered by Defendants due to the Plaintiff's disability.

169.    The District intentionally discriminated against Plaintiff by totally denying her access to education.

170.    The District otherwise violated Plaintiff's rights under the CADA.

171.    Plaintiff's IDEA and CADA rights are comingled and retaliation against the Plaintiff's IDEA rights constitutes retaliation against her CADA rights.

172.    When the Plaintiff attempted to vindicate her rights, the District retaliated by seeking truancy proceedings.

173.    Upon losing in court, the District continued to retaliate by failing to comply with the ALJ's order, delaying providing V.B.'s services, and creating unnecessary and unlawful conditions before providing the services, among others

174.    As a direct and proximate cause of the District's retaliation in violation of CADA, the Plaintiff has suffered and continues to suffer denial of education, and infringement upon her rights.

**COUNT VII**
**VIOLATION OF THE EQUAL PROTECTION CLAUSE**
(***Against the Individually Named Defendants***)

175.    Plaintiff incorporates, by reference, all previous paragraphs of the Complaint herein.

176.    The Plaintiff is an individual entitled to the full protection of the Equal Protection Clause of the U.S. Constitution, U.S. Const. Amend. 14, and as coequally protected by the Colorado State Constitution, Colo. Const. Art. II, Section 3; *id.,* Section 6; *id.,* Section 25.

177.    Defendants Lindsey, Scott, de Jong, Brzozowski, Hellstrom, Leap, Fulton, Divitto, Hillman, and Besmer are each individuals subject to the Equal Protection Clause and its Colorado corollary.

178.    The Plaintiff is a member of a class of disabled students who require homebound education.

179.    Defendants Lindsey, Scott, de Jong, Brzozowski, Hellstrom, Leap, Fulton, Divitto, Hillman, and Besmer violated Plaintiff's constitutional rights to equal protection by

denying her access to and the benefits of the school District's educational programs which are afforded to all children within the District's jurisdiction.

180.    Each individual Defendant chose to violate Plaintiff's right to equal protection by requiring her to risk life-threatening infection to received public education.

181.    Each individual Defendant participated in and ratified this decision.

182.    At the time of the complained of events, the Plaintiff had a clearly established constitutional right to equal protection under the law, including the right to equally access and receive the benefits of the Defendants' public education programs.

183.    Any reasonable school official or other employee knew or should have known of this right at the time of the complaint conduct.

184.    Defendants Lindsey, Scott, de Jong, Brzozowski, Hellstrom, Leap, Fulton, Divitto, Hillman, and Besmer displayed raw animus against Plaintiff's class of disabled persons by flagrantly ignoring the advice of three independent doctors and by placing her in-school, at life-threatening risk to her health.

185.    Government action rooted in bare animus against the disabled cannot survive rational basis review. *City of Cleburn v. Cleburn Living Ctr.*, 473 U.S. 432, 450 (1985).

186.    Each of Defendants Lindsey, Scott, de Jong, Brzozowski, Hellstrom, Leap, Fulton, Divitto, Hillman, and Besmer's actions against V.B. are rooted in prejudice against disabled students who require homebound services.

185.    The individual Defendants' animus against children of the Plaintiff's class caused her injuries.

186.    The actions and inactions of the individual Defendants' employer, the District, was the moving force and causal factor underlying the Plaintiff's constitutional violations.

187.    Because the Districts actions and inactions were causal factors of the underlying constitutional violation, the District must indemnify each of the named Defendants.

188.    By failing to sufficiently train and discipline its employees, the District caused the Plaintiff to be subjected to a violation of her constitutional rights.

189.    The involvement of high-ranking District officials, including Defendant Lindsey, was the cause and moving force of the Plaintiff's constitutional deprivations.

190.    The named Defendants' conduct described herein was attended by circumstances of malice, or willful and wanton conduct, which the Defendants must have realized was dangerous, or done with reckless disregard for V.B.'s safety and her life.

191.    The acts or omissions of the individual Defendants were the legal and proximate cause of the Plaintiff's damages.

192.    The Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgement interest and costs as allowable by federal law.

193.    In addition, Plaintiff is entitled to punitive damages against the named Defendants, in that their actions were taken maliciously, willfully, or with a reckless or wanton disregard of the constitutional rights of the Plaintiff.

### COUNT VIII
### 42 U.S.C. § 1983 – Failure to Hire, Investigate, Train, Supervise, and Discipline
### *Monell* Claim (*Against Defendant A20*)

194.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

195.    The District failed to properly train, supervise, and discipline its employees, including the named Defendants, over a period of at least a decade, with respect to it and their obligations to provide homebound services to disabled children.

196.    The District further failed to properly train, supervise, and discipline its employees, by inculcating a responsibility on the part of its employees—through formal policy, training, and actual practices and habits—to disregard the recommendations of doctors and medical evidence in favor District policy, whether explicit or implicit.

197.    The District's failure to, in its supervisory duties, adequately train and hire, supervise, and discipline, its employees with respect to the constitutional rights of children within its jurisdiction is a custom, policy, or practice of the District and the moving force behind the constitutional violation described herein.

198.    The constitutional violations perpetrated against the Plaintiff in this matter were a foreseeable consequence of the District's actions and inactions.

199.    The District was deliberately indifferent to the constitutional rights of children and families within its jurisdiction by failing to properly train, monitor, supervise, and discipline its employees with respect to the provision of homebound services. The District could have and should have pursued reasonable methods of training, monitoring, supervising, and disciplining its employees.

200.    The District's policies, customs, and/or practices in failing to properly hire, train, monitor, supervise, and discipline its employees were the causal force and proximate cause of the violation of the Plaintiff's federal and state constitutional rights.

201.    The acts or omissions of the District caused Plaintiff damages in that she suffered total denial of education for at least one year, continuing denial thereafter, and repeated acts of retaliation. Plaintiff's damages caused not only harm to her education and future, but also emotional and mental suffering.

202. The actions or omissions of the District as described herein deprived Plaintiff of the rights, privileges, liberties, and immunities, secured by the Constitution of the United States of America, and caused her other damages.

COUNT IX

REQUEST FOR ATTORNEYS' FEES, 20 U.S.C. § 1415(i)(3)(B)

203. Plaintiff incorporates the allegations set forth above as if fully set forth herein.

204. IDEA, 20 U.S.C.S. § 1400 et seq., provides that "in any action or proceeding brought under 20 U.S.C.S. § 1415, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the prevailing party." 20 U.S.C.S. § 1415(i)(3)(B).

205. Because IDEA only authorizes the courts, and not the administrative hearing officer, to award attorneys' fees, a party may only recover attorneys' fees for administrative proceedings by filing an independent suit in the district court. *Patrick G. v. Harrison Sch. Dist. No. 2*, 40 F.4th 1186, 1209 (10th Cir. 2022); *Bd. of Educ. of Oak Park v. Nathan R. ex rel. Richard R.*, 199 F.3d 377, 381 & n.10 (7th Cir. 2000); *see also R. M-G v. Bd. of Educ. for the Las Vegas City Schs.*, 645 F. App'x 672, 677 (10th Cir. 2016) (unpublished) ("The IDEA clearly allows the pursuit of a lawsuit solely to recover fees.").

206. "Parents prevail 'when actual relief on the merits of [the child's] claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.'" *Miller v. Bd. of Educ.*, 565 F.3d 1232, 1247 (10th Cir. 2009) (citing Urban ex rel. Urban v. Jefferson County Sch. Dist. R-1, 89 F.3d 720, 729 (10th Cir. 1996) (quoting *Farrar v. Hobby*, 506 U.S. 103, 111-12, 113 (1992))).

207.    Although independent hearing officers do not have the authority to award attorney's fees, they may make certain factual findings about a party's right to recover fees. For example, the IDEA Part B regulations expressly contemplate the possibility of independent hearing officers making factual findings as to whether a proposed FAPE settlement was more favorable than the relief the parents ultimately obtained. *See* 34 C.F.R. 300.517 (c)(2)(i)(C). The Office of Special Education Programs has stated that independent hearing officers may make findings as to whether a parent prevailed in a due process proceeding. Letter to Anonymous, 19 IDELR 277 (OSEP 1992).

208.    The ALJ did not have the authority to award V.B. attorneys' fees. However, in concluding that the District violated FAPE and its Child Find duty with respect to V.B. and in awarding V.B compensatory services, the ALJ properly indicated that V.B and her Parents were the prevailing party in the underlying due process matter.

## IV.    PRAYER FOR RELIEF

WHEREFORE, the Plaintiff requests the following relief:

A.  Find that the Defendant violated state and federal law;

B.  Find the Plaintiff is the prevailing party;

C.  Award the Plaintiff equitable relief in amounts to be determined at trial;

D.  Award the Plaintiff compensatory damages in amounts to be determined at trial;

E.  Award the Plaintiff compensation for all money that Plaintiff, through her parents, had to expend to receive services while being denied by the Defendants;

F.  Order the Defendant to provide compensatory services to Plaintiff for the academic setbacks she has experienced due to the Defendant's denial of FAPE.

G.  Award the Plaintiff her reasonable attorneys' fees and costs under 42 U.S.C. § 1988

and/or other applicable statutes;

H.  Any other relief deemed necessary or appropriate.

*/s/ Conor O'Donnell*
Igor Raykin
Conor O'Donnell
Kishinevsky & Raykin, Attorneys at Law
2851 S. Parker Rd., Suite 150
Aurora, CO 80014 Phone: 720-748-8888
igor@coloradolawteam.com
conor@coloradolawteam.com
***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

This is to certify that on December 31, 2024 the foregoing FIRST AMENDED COMPLAINT WITH JURY DEMAND was filed with the Court via the CM/ECF system which shall simultaneously serve all parties of record.

_s/Krystle Jennings_
Krystle Jennings, Paralegal